IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL L. GRIFFITH, | ) | CASE NO. 3:13CV02136 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Daniel L. Griffith ("Griffith") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income benefits ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a

Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

Griffith was award SSI benefits in January 1995 due to mental health impairments.[1]  Tr.

140, 45, 54.  He continued to receive SSI benefits until May 2008, when he was incarcerated for

over one year for drug possession.  Tr. 140, 45-46, 55.  Following his release from prison,

Griffith refiled an application for SSI on January 15, 2010, alleging a disability onset date of

September 1, 1994.  Tr. 121, 125.  He alleged disability because of affective disorders and

---

[1]  Griffith testified that he received SSI benefits for severe depression and anxiety.  Tr. 45, 54.

depression.  Tr. 144.  After denials by the state agency initially (Tr. 93-97) and on reconsideration (Tr. 102-08), Griffith requested an administrative hearing.  Tr. 109.  A hearing was held before Administrative Law Judge ("ALJ") Christopher B. McNeil on May 15, 2012.  Tr. 29-66.  In his June 8, 2012, decision (Tr. 74-86), the ALJ determined that Griffith's residual functional capacity ("RFC") did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled.  Tr. 84.  Griffith requested review of the ALJ's decision by the Appeals Council.  Tr. 10-11.  On July 31, 2013, the Appeals Council denied Griffith's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Griffith was born in 1968 and was 41 years old on the date his application was filed.  Tr. 84.  He has a ninth grade education and is able to communicate in English.  Tr. 35, 84.  He has no past relevant work.  Tr. 84.

### B. Medical Evidence

#### 1. Physical Evidence

**Back and neck pain.**  On January 11, 2002, Griffith had an MRI of his lumbar spine.  Tr. 385.  On September 11, 2002, Michael G. Mulligan, M.D., reviewed the MRI results and diagnosed spondylitic changes with significant bilateral foraminal stenosis in L5-S1, and a small central disc prolapsed at L4-5 with spondylitic changes producing mild bilateral foraminal stenosis.  Tr.  385-86.   Upon physical examination, Dr. Mulligan described a dramatically decreased range of motion in Griffith's lumbar area "with reproduction of pain in all motions."  Tr. 386.  He observed that Griffith had hamstring tightness.  Tr. 386.  The range of motion of

Griffith's hip and knee were normal, as was his posture.  Tr. 386.  His gait was slow, wide-based and guarded.  Tr. 386.  He had minimal tenderness and reported that the pain is deeper than Dr. Mulligan was able to palpate.  Tr. 386.  Dr. Mulligan diagnosed intravertebral disc disorder.  Tr. 386.  He explained that he "had a long talk with [Griffith] about smoking cessation, what kind of pain he can listen to and what he needs to not listen to.  I told him that he is very deconditioned and he needs to start getting in better shape for that."  Tr. 386-87.  He advised Griffith to begin exercises to strengthen his back and stomach.  Tr. 387.

On October 10, 2002, Griffith had a second MRI that also revealed bilateral neural foraminal encroachment at L4-5 related to discogenic disease.[2] Tr. 380-81.  On March 17, 2003, Christian Bonasso, M.D., performed surgery involving a multiple level laminectomy and facetectomy with bilateral foraminotomy, and internal fixation with a clarus spinal rod system. Tr. 354-356.

On July 25, August 8 and October 17, 2005, Dr. Aleksy Prok, M.D., a pain management specialist, treated Griffith with a series of three nerve branch blocks to alleviate symptoms of pain.  Tr. 775, 780, 784, 562.  On March 13, 2006, Dr. Prok treated Griffith with epidural steroid injections to alleviate symptoms of pain.  Tr. 766.  On January 10, 2006, Dr. Prok prescribed Methadone after Griffith reported that his Duragesic patches were not alleviating his symptoms. Tr. 767-768.

On June 25, 2006, Griffith was seen by a nurse while he was incarcerated at the North Central Correctional Institute.[3]  Tr. 637.  The nurse assigned him a 30-day work restriction of lifting no more than five pounds; standing for no longer than fifteen minutes; and having one medical "lay-in" day.  Tr. 637.

_____

[2]  The treatment note does not indicate the name of the physician that generated the report.

[3]  Griffith was incarcerated intermittently during 2006-2008, although the exact dates are not discernible.

On July 9, 2007, a prison doctor, Dr. Ahmed, assigned Griffith a one-year restriction to lifting no more than ten pounds; avoiding slippery surfaces; and having a sit-down job only.  Tr. 598.

On September 14, 2006, Griffith had an MRI of his cervical spine after complaining of neck pain.  Tr. 625.  The radiologist, Donald Chakeres, M.D., noted: "There is some multilevel disc degeneration.  The worst findings are at C7-T1 with large anterior osteophystes.  There are a few minor bulges and some minor narrowing in a few of the neural foramina but I do not see a major problem."  Tr. 625.  On September 18, 2007, Dr. Ahmed again assigned Griffith a one-year work restriction of lifting no more than ten pounds; standing for no longer than fifteen minutes; and no bending or kneeling.  Tr. 624.

On August 17, 2008, an unidentified prison doctor assigned Griffith a one-year work restriction of lifting no more than ten pounds; avoiding slippery surfaces; and having a sit-down job only.  Tr. 723.  Griffith was assigned the same restrictions again on August 28, 2009.  Tr. 921.

On January 5, 2010, Griffith had a CT scan of his lumbar spine after describing sharp and continuous pain.  Tr. 288-289.  Dr. Brendan Astley noted that Griffith was tender when his paraspinal muscles were palpated.  Tr. 288.  He found grade 1 spondylolisthesis of L5-S1 with associated degenerative changes of the disc and ankylosing spondylolisthesis.  Tr. 289.  Upon referral from Dr. Astley, Griffith received an epidural steroid injection on January 14, 2010.  Tr. 285-286.

**Pulmonary embolism.**[4]  On July 11, 2008, Griffith was diagnosed with a pulmonary embolism and acute pulmonary infarct.  Tr. 76, 625.  It was recommended that he take

---

[4]  Griffith does not allege that the ALJ erred in his findings regarding Griffith's pulmonary embolism impairment. For the sake of completeness, the Court briefly summarizes the medical history regarding this ailment.

anticoagulants for the rest of his life, although he "is completely asymptomatic." Tr. 280.  He testified that he does not experience any pain or fatigue. Tr. 44.  At times, Griffith took Coumadin, an anticoagulant, as prescribed.  Tr. 280, 458.

### 2.  Mental Evidence

According to a treatment note from Marion Area Counseling ("Marion"), Griffith first received treatment there in 1994 for alcohol dependency, dysthymia and personality disorder after an overdose suicide attempt. Tr. 569.  The earliest evidence in the record is a treatment plan dated May 8, 2001, explaining that Griffith was referred by the county court for alcohol or other drug assessment and domestic violence classes. Tr. 580.  Upon mental examination, he was described as polite and cooperative, with a blunted affect.[5] Tr. 580.  He complained that he had been depressed for years. Tr. 580.  He was described as "negative" and having no motivation and poor sleep, although he reported that his social anxiety was not as severe as it had been. Tr. 580.  The plan states, "[s]ays on SSI for depression but is ashamed and says it is for back injury.  Refuses antidepressant—won't take pills." Tr. 580.  In summary, the plan reads, "it is too bad he is resistant to meds as they could improve his depression and anxiety." Tr. 580.  Griffith was diagnosed with alcohol dependency, marijuana abuse, and dysthymic disorder.  Tr. 580.  He was assigned a GAF of 50.[6] Tr. 579, 580.  On April 2, 2002, Griffith fulfilled the plan requirements and was terminated from the program.  Tr. 579.

Griffith's next treatment record is from Marion and is dated April 18, 2005.  Tr. 569-577.  Once again, he was referred by the county court, this time because of alcohol related vandalism.

---

[5]  The name of the individual assessing Griffith is illegible.

[6]  GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

Tr. 569.  Griffith stated, "[t]he court wants me to get an evaluation.  I know I'm okay."  Tr. 569.

The reviewer noted that Griffith was on Methadone and Norco because of chronic back pain, and

that his Methadone prescription had been increased because Griffith had developed a tolerance.

Tr. 569.  Griffith reported that he sometimes takes more than prescribed, runs out of the

medication, and "can't hardly stand it."  Tr. 569.

      The assessor, D. Hawley, BSN, RN, PCC, described Griffith's relationship with drugs

and alcohol as severe and chronic.  Tr. 569.  Hawley also found that Griffith's social,

recreational and work-related activity had decreased because of continued chemical use.  Tr. 570.

Upon mental examination, Griffith's motor activities, manner, attitude and speech were normal.

Tr. 574-575.  His affect was pressured and rapid.  Tr. 575.  His memory, perception, attention

and concentration were normal.  Tr. 575.  His insight and judgment were good.  Tr. 575.  He had

insomnia, weight loss and decreased appetite.  Tr. 575.  He denied having suicidal thoughts and

reported no known attempt.  Tr. 575.  He was assigned a GAF of 50.  On December 20, 2005,

Griffith was discharged from the program.  Tr. 567-568.

      On December 27, 2005, Griffith presented to an emergency room.  Tr. 562.  Dean R.

Schilling, MA, PCC, completed a crisis intervention assessment. Tr. 562.  Schilling explained

that Griffith was "brought to the ER by his father complaining of chronic back pain, feelings of

hopelessness, depression, and needing someone to talk to.  Client denied suicidal plan or intent."

Tr. 562.  Schilling observed that Griffith "appeared to feel guilty about causing his back injury

due to drinking and being in a car accident[], yet strangely denied that his back problems are a

direct result of that and has been told that his back problems are due to a genetic degenerative

back disorder."  Tr. 562.  Griffith complained about his doctors' ineffective pain prescriptions

and accused Dr. Prok of withholding Vicodin as a punitive measure.  Tr. 562.  At the time of the

assessment, Dr. Prok had taken Griffith off Vicodin and prescribed a duragesic patch for pain. Tr. 562.  Schilling noted that Griffith's wife encouraged him to "give the patch time to work," but that Griffith "refused."  Tr. 562.  He also described how Griffith failed to understand that the post-surgical medication dosages prescribed by his doctors were for acute, post-surgical pain, and not intended to be a long-term maintenance dose.  Tr. 562.  At the emergency room, Griffith was given a shot of Tegretol and Phenergan to resolve his pain symptoms.  Tr. 562.  Schilling concluded that Griffith "gives some indication of potential Vicodin addiction" and that "there are several factors in this account that do not logically add up."  Tr. 562.

Upon mental examination, Griffith was described as "sitting comfortably on the ER bed." Tr. 562.  He had adequate eye contact and grooming, and a pleasant, cooperative manner.  Tr. 562.  He was alert and oriented, albeit with intermittent tearfulness and depressed affect.  Tr. 562.  His thought process was described as clear, coherent, logical and goal directed with no sign of blocking or concentration problems.  Tr. 562.  His intellect, insight and judgment were rated average.  Tr. 562.  He was assessed a GAF of 60.[7]  Tr. 564.

Griffith was incarcerated from 2006 through 2009 and received mental health treatment. See, e.g., Tr. 873, 878, 881, 885, 892, 901.  He was generally described as having a depressed mood.  See, e.g., Tr. 873, 901.  He was prescribed Elavil for depression on November 30, 2006. Tr. 620.

On February 27, 2007, while on probation, Griffith was taken to the emergency room after he overdosed on Elavil pills.  Tr. 537.  He explained that he had been drinking with friends and that he did not recall taking the pills.  Tr. 540.  His diagnosis assessment, prepared by Debra Merold, a social worker, indicates illegal drug abuse, prescription drug abuse, and alcohol abuse.

---

[7]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  See DSM-IV-TR, at 34.

Tr. 544.  Upon mental examination, Griffith was described as depressed because of concerns regarding the breakup of his marriage.  Tr. 540, 547, 548.  He was not interested in a referral to Alcoholics Anonymous or another support group.  Tr. 548.  Merold diagnosed him with moderate depressive psychosis and assigned a GAF of 50.  Tr. 549.

Griffith returned to prison and, on May 11, 2007, was assessed by Abul Q. Hasan, M.D. Tr. 847-48.  Dr. Hasan diagnosed Griffith with a mood disorder and assessed a GAF of 60.  Tr. 848.  He noted that Griffith reported improvement on Elavil (Tr. 811) and gradually increased the dosage.  Tr. 849.

On November 3, 2008, Griffith stopped taking Elavil because it interfered with his ability to urinate when directed to do so in order to comply with a urine test.  Tr. 804.  A month later he stated that he was doing "okay" without it.  Tr. 804.

By May 2009, Griffith was taking Prozac, but admitted it was only to help him sleep and that he did not have problems with sleep "in the open community."  Tr. 797-798.  He refused mental health aftercare services.  Tr. 798.  On November 24, 2009, while living in a halfway house, Griffith saw Dr. Astley for back pain and reported no complaints of depression.  Tr. 295. Dr. Astley reinforced the importance of strengthening exercises.  Tr. 289.

On April 7, 2011, Dennis Rumer, a therapist at Marion, completed a diagnostic assessment.  Tr. 487.  Griffith had completed phase one of his Alcoholics Anonymous program and had avoided cannabis for six months.  Tr. 487.  He reported a lifelong history of depression characterized by isolation, loss of motivation, insomnia, increased pain and recurrent suicidal thoughts. Tr. 487.  Rumer diagnosed him with alcohol and cannabis dependence and

assigned a GAF of 40.[8]  Tr. 488.  A week later he was examined at Marion by Sharon Orso, MSN.  Tr. 482.   Orso noted that Griffith was off medication and she prescribed him Cymbalta, for depression and back pain, and Seroquel.  Tr. 482.  She diagnosed major depression-recurrent and assigned a GAF of 45.  Tr. 482.

On May 15, 2011, Griffith presented to the emergency room complaining of rib pain.  Tr. 509.  He reported that he fell while walking on some rocks.  Tr. 509.  He indicated that he was not taking medication.  Tr. 509.  He was discharged with a diagnosis of bruised ribs and prescribed Vicodin.  Tr. 508.

Griffith had no further contact with Marion.  On September 6, 2011, he was discharged from the program because he failed to continue treatment.  Tr. 516-17.

## C.  Non-Medical Evidence

On February 24, 2010, Griffith filled out a function report.  Tr. 152-159.  His described his daily activities as watching television all day and going to the doctors every few weeks.  Tr. 152.  He stated that he never prepares his own meals because he does not know how to cook and it has always been done for him.  Tr. 154.  He rarely goes outside and does not shop.  Tr. 155.  He does not like being alone, but does not like being around people he does not know.  Tr. 155, 157.  He gets along "good" with authority figures and follows written and oral instructions well.  Tr. 157-158.  He does not handle changes in routine or stress well.  Tr. 158.

## D.  Medical Opinion Evidence

### 1.  Consultative Examiners

#### a. Sudhir Dubey, Psy.D.

---

[8]   A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV-TR at 34.

On May 10, 2010, Dr. Dubey conducted a psychological consultative examination. Tr. 307-11.  Griffith reported a history of back pain and blood clots but denied current and past psychiatric care.  Tr. 308.  He stated that his physical symptoms affect his ability to work.  Tr. 308.  Upon mental status examination, Dr. Dubey described Griffith's posture, gait, and behavior as normal.  Tr. 308-09.  His thought process was logical.  Tr. 309.  Griffith complained that he was feeling stressed that day and described his general mood as depressed.  Tr. 309.  He denied feeling discouraged, hopeless, helpless or guilty.  Tr. 309.  He denied suicidal or homicidal ideation.  Tr. 309.  Dr. Dubey noted that Griffith's symptoms are consistent with mild depression.  Tr. 309.

Griffith reported that he spends his days watching television.  Tr. 310.  He claimed that he can perform daily chores independently if needed.  Tr. 310.  He is able to bathe and perform personal hygiene adequately.  Tr. 310.   He is able to drive and has a temporary license and he interacts socially with family.  Tr. 310.  He reported no recreational activities or hobbies and complained of a depressed mood, in part because he was having problems adjusting after being released from prison.  Tr. 310.  Dr. Dubey, in summary, opined that Griffith was consistent, credible and reliable.  Tr. 310.

Dr. Dubey diagnosed Griffith with adjustment disorder with depressed mood and personality disorder.  Tr. 311.  He found that Griffith was not impaired in his ability: to understand, remember, and follow simple instructions; to maintain attention, concentration, persistence, and pace; to perform simple, repetitive tasks; to relate to others, including fellow workers and supervisors; and to understand and follow complex instructions. Tr. 311.  He found that Griffith was mildly impaired in his ability to: withstand stress and pressure associated with

day-to-day work; and perform complex tasks.  Tr. 311.  He assessed a GAF of 65 based on Griffith's overall levels of functioning.[9]  Tr. 310.

### b. Don McIntire, Ph.D.

On July 7, 2011, Dr. McIntire completed a mental functional capacity assessment. Tr. 501-03.  Upon mental status examination, Dr. McIntire described Griffith as having a well-coordinated gait and full use of limbs.  Tr. 502.  He noted that Griffith appeared friendly but depressed.  Tr. 502.  Griffith reported that he was: depressed, anxious, paranoid, and suffered from panic attacks; and that he had feelings of hopelessness, worthlessness, irritability, and low self-esteem.  Tr. 502.  Although Griffith was taking Cymbalta and Seroquel he reported no benefit.[10]  Tr. 502.  He related a history of suicide attempts, including his overdose on pills in 2007.  Tr. 502.  His concentration was poor, but he reported no problems with short-term memory.  Tr. 502.  He could recall two of three items after five minutes and perform serial sevens "a little."  Tr. 502-03.

Dr. McIntire found that Griffith was markedly limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; and work in coordination without being distracted.  Tr. 501.  He found him moderately limited in his ability to carry out detailed instructions.  Tr. 501.

### 2.  State Agency Opinions

### a. Physical Review

---

[9]  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

[10]  Cymbalta is used to treat major depressive disorder and for pain relief.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 457, 572.  Seroquel is used to treat psychotic disorders.  *Id*. at 1566, 1698.

On December 3, 2010, Nick Albert, M.D., completed a physical residual functional capacity assessment. Tr. 337-344.  Dr. Albert opined that Griffith could lift and carry up to 20 pounds occasionally and 10 pounds frequently. Tr. 338.  Griffith could stand or walk for up to six hours, sit for six hours, and was unlimited in the amount he could push or pull, subject to the lift and carry limitations. Tr. 338.  He could never climb ropes, ladders or scaffolds, and could occasionally stoop and crawl. Tr. 339.  Dr. Albert concluded that Griffith's allegations as to the severity of his illnesses and the effect on his functions were not supported.  Tr. 342.  He noted that Griffith was documented with no motor deficit, radiculopathy, neuropathy, or myelopathy. Tr. 342.

### b. Mental Review

On June 5, 2010, Ellen Rozenfeld, Psy.D., completed a psychiatric review technique.  Tr. 314-24.  She noted that she did not have Griffith's treatment records and based her opinion on Dr. Dubey's examination and Griffith's function report.  Tr. 324.  She opined that Griffith had adjustment disorder with depressed mood and personality disorder, but that neither was a severe impairment causing more than mild limitations in functioning. Tr. 314, 317, 319, 322-324.  On October 7, 2010, Bruce Goldsmith, Ph.D., affirmed Dr. Rozenfeld's opinion.  Tr. 333.

## E.  Testimonial Evidence

### 1.  Griffith's Testimony

Griffith was represented by counsel and testified at the administrative hearing.  Tr. 34-58. He testified that he received SSI benefits beginning in 1994 or 1995 because of severe depression and anxiety.  Tr. 45.  When he was previously imprisoned his benefits were cancelled

but began again upon his release; however, upon his imprisonment for over one year, beginning in May 2008, his benefits were cancelled and he had to reapply upon his release.[11]  Tr. 45-46.

In 1997 Griffith was involved in a car accident and injured his back.  Tr. 42, 54.  He stated that the pain from his neck and back prevents him from working.  Tr. 53.  He has not had a job in the last fifteen years. Tr. 51, 55-56.

Griffith stated that his is divorced and sleeps on a couch at his parents' house.  Tr. 36.  His testified that his depression and anxiety did not improve at all since 1994.  Tr. 45.  He spends his days "sitting around" and watching television.  Tr. 48.  He takes showers daily and is able to get dressed, although he has difficulty putting on shoes and socks.  Tr. 41, 47.  He is able to drive, although he no longer has a driver's license.  Tr. 35-36.  He walks down the street to visit his brother a few times a week, but otherwise keeps to himself.  Tr. 50.  He has trouble sleeping because of "thoughts" and "pain."  Tr. 49.  He testified that he has crying spells daily and a poor appetite.  Tr. 49.  He also stated that he struggles with thoughts of suicide daily, and that he has attempted suicide two or three times in the past.  Tr. 46-47.

He has not seen doctors after being released from prison because he has been unable to get a medical card, although he testified that he went to a counseling center for treatment the "last two, three weeks."  Tr. 50.  He stated that he went there previously and received medication, but that it did not help him so he gave up.  Tr. 51.  He admitted that he lied to prison staff when he denied having mental health issues.  Tr. 56-57.  He lied because the prison had a special unit for inmates with mental health issues, in which the inmates were given less freedom and he did not want to be placed in such a unit.  Tr. 56-57.

---

[11]  *See* 20 C.F.R. §§ 416.211(a)(1); 416.201 (a claimant is not eligible for SSI benefits while a resident of a public institution, such as a prison).

Griffith's back and neck pain began to manifest in 2000, a few years after his car accident.  Tr. 39.  He had surgery in 2002 but it did not help relieve the pain.  Tr. 39.  Medication dulled the pain "a little bit."  Tr. 40.  He stated that the prison doctors assigned him work restrictions because they did not want to take chances that his pain would get worse.  Tr. 40.  He testified that his back hurts when he moves and that he does not try to lift anything.  Tr. 37, 41.  He can walk a few blocks before having to rest, and he can sit for a half an hour before he starts getting painful.  Tr. 52, 53.  He stopped drinking and smoking marijuana eight months ago.  Tr. 42.

Griffith testified that he is prevented from working an eight-hour workday because he does not "function right" around people he does not know, and because of pain.  Tr. 53.

### 2.  Vocational Expert's Testimony

Vocational Expert Lynne Kaufman ("VE") testified at the hearing.  Tr. 59-65.  The ALJ asked the VE  to determine whether there was any work that a hypothetical individual of Griffith's education and work experience could perform if the person had the following characteristics:  can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; push or pull to the same extent, using hand or foot controls; stand or walk about six hours; sit about six hours in an eight-hour work day; cannot climb ladders, ropes, or scaffolds; can frequently climb ramps or stairs; can frequently balance, kneel, and crouch, and occasionally stoop or crawl; must avoid concentrated exposure to extreme cold and to wetness and humidity; and must avoid even moderate exposure to unprotected and hazardous machinery.  Tr. 61, 79.  The VE testified that the person could perform light jobs, including the following:  cashiering jobs (over one million national jobs, 42,000 Ohio jobs); assembler jobs (200,000 national jobs; 7,500 Ohio jobs); and packing jobs (130,000 national jobs; 5,000 Ohio jobs).  Tr. 62.

14

Next, Griffith's attorney asked the VE if there were any occupations a hypothetical individual with the characteristics previously described and with the following additional limitations could perform: marked limitations in the person's ability to maintain attention and concentration for extended periods, work in coordination with others or with proximity to others without being distracted by them, complete a normal workday and work week without interruptions from psychologically based symptoms, and accept instructions and respond appropriately to criticism from supervisors.  Tr. 63-63.  The VE responded that there would be no jobs that such an individual could perform.  Tr. 64.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

15

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[12] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed.

2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of

proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.

1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has

the vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his June 8, 2012, decision, the ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since January 15, 2010, the application date.  Tr. 76.

2.      The claimant has the following severe impairments:  degenerative disc disease with spondylosis, pulmonary embolism and infarction, and coronary artery disease.  Tr. 76.  However, the claimant's depression, hypertension, and tobacco abuse are not severe impairments.  Tr. 76.

---

[12] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[13]  Tr. 79.

4.      The claimant has the residual functional capacity to occasionally lift and carry 20lbs, frequently lift and carry 10lbs, can push and pull to the same extent using hand or foot controls, can stand or walk about 6 hours in an 8-hour workday, can frequently climb ramps and stairs, can frequently balance, kneel, and crouch, can occasionally stoop or crawl, but cannot climb ladders, ropes or scaffolds, must avoid concentrated exposure to extreme cold, wetness and humidity, and avoid moderate exposure to unprotected heights and hazardous machinery.  Tr. 79.

5.      The claimant has no past relevant work.  Tr. 84.

6.      The claimant was born [in 1968] and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed.  Tr. 84.

7.      The claimant has a limited education and is able to communicate in English.  Tr. 84.

8.      Transferability of job skills is not an issue because claimant does not have past relevant work.  Tr. 84.

9.      Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 84.

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 15, 2010, the date the application was filed.  Tr. 85.

## V. Parties' Arguments

Griffith objects to the ALJ's decision on two grounds.  He asserts that the ALJ's finding

that Griffith did not have a severe mental impairment is not supported by substantial evidence

---

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

and that the ALJ improperly evaluated Griffith's mental conditions. He also contends that the ALJ's physical RFC determination is not supported by substantial evidence.

In response, the Commissioner submits that the ALJ's decision is supported by substantial evidence.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ's Step Two finding is supported by substantial evidence

Griffith argues that the ALJ erred in Step Two when he found that Griffith did not have a severe mental impairment despite "all relevant evidence" to the contrary. Doc. 14, p. 10.

"An impairment or combination of impairments is not severe if it does not significantly limit [ ] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). When referring to "basic work activities," the Commissioner means the abilities and aptitudes necessary to do most jobs. 20 C.F.R. § 416.921(b). Basic work activities include: understanding, carrying out and remembering simple instructions; use of judgment; responding

appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. *Id.*

The claimant has the burden at Step Two to establish that he "suffers from a severe medically determinable physical or mental impairment." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). The severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* The purpose of Step Two is to allow the Commissioner the ability "to screen out 'totally groundless claims'" from a medical standpoint. *Id.* at 863 (citing *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 n.1 (6th Cir. 1985)). To evaluate the severity of mental impairments, the Commissioner considers four functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c)(3). Generally, a finding of "none" or "mild" in the first three areas and a finding of "none" in the fourth area will lead to the conclusion that the impairment is not severe, unless the evidence supports that there is more than a minimal limitation in ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).

Here, the ALJ found that Griffith's depression and anxiety were not severe impairments because they do not cause more than minimal limitations in his ability to perform basic mental work activities.[14] Tr. 76, 77. In making this determination, the ALJ considered the four functional areas outlined in 20 C.F.R. § 416.920a(c)(3). He found that Griffith had mild limitations in his activities of daily living, social functioning, and concentration, persistence and pace, and that Griffith had no episodes of decompensation. Tr. 77-78. He based these findings

---

[14] The ALJ determined that Griffith had the following severe physical impairments: degenerative disc disease with spondylosis, pulmonary embolism and infarction, and coronary artery disease.

on Griffith's function report (Tr. 152-159), Dr. Dubey's psychological examination (Tr. 307-312), and Griffith's testimony at the hearing (Tr. 34-58).  Tr. 77-78.

Specifically, the ALJ found that Griffith's activities of daily living included watching television, listening to music, and going to the doctor every few weeks.  Tr. 77.  He took a shower every day and socially interacted with family members, including a brother he visited a few time a week.  Tr. 77.  He is able to drive.  Tr. 77.  In the area of social functioning, the ALJ noted that Griffith spoke to his children on the telephone and visited doctors.  Tr. 77.  He pointed out that Griffith reported that he got along well with authority figures and had not been terminated from a job because of his failure to get along with others.  Tr. 77.  Griffith described his relationship with his siblings and children as "okay," and reported to Dr. Dubey that he did not have issues dealing with public agencies, neighbors, or others.  Tr. 78.  In the area of concentration, persistence and pace, the ALJ observed that Griffith stated that he was able to finish what he started and was able to pay attention "all the time."  Tr. 78.  During Dr. Dubey's examination, Griffith was oriented to person, place, time and evaluation; he was alert and responsive; he recalled six numbers forward and four numbers backward and was able to recall two of three objects after a five-minute delay. Tr. 78.  He denied trouble concentrating or remembering.  Tr. 78.

In conclusion, the ALJ found that the totality of the evidence reflected no more than mild limitations.  Tr. 78.  In so finding, the ALJ gave great weight to consultative examiner Dr. Dubey's opinion and the opinion of the state agency reviewers Dr. Rozenfeld and Dr. Goldsmith.  Tr. 79.  He assigned little weight to the opinions of consultative examiner Dr. McIntire and Marion therapist Dennis Rumer.  Tr. 79.

### 1.  The ALJ was not required to consider Griffith's GAF scores

Griffith argues that his GAF scores indicate that he has more than mild limitations.  Doc. 14, p. 11.  He explains that he was assessed a GAF score on fifteen occasions and received a GAF of 50 or less on eight occasions, including four GAF scores of 40.  Doc. 14, p. 11.  He admits that his remaining GAF scores "were all in the moderate range," but attributes this to his incarceration at the time that most of the scores were assessed.  Doc. 14, p. 11.  He argues that incarceration created "a highly structured setting that could eliminate many environmental stresses and alleviate many of the symptoms and signs of his mental health impairments."  Doc. 14, p. 11 (citing 20 C.F.R. Part 404, Subpt. P, app'x 1, 12.00 (E) and (F)).[15]

A GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."  *White v. Comm'r of Soc. Sec*., 572 F.3d 272, 276 (6th Cir. 20)09) (internal quotation marks and citation omitted). It "does not have a direct correlation to the severity requirements in [ ] mental disorders listings."  65 Fed. Reg. 50746, 50764–65 (2000); *Oliver v. Comm'r of Soc*. Sec., 415 Fed. App'x 681, 684 (6th Cir. 20)11) (A GAF score "is not particularly helpful by itself."); *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 241 (6th Cir. 20)02) (a GAF score is not essential to the RFC's accuracy).  The Diagnostic and Statistical Manual of Mental Disorders ("DSM") no longer includes the GAF scale.  *See Murray v. Comm'r of Soc. Sec*., 2013 WL 5428734 (N.D. Ohio Sept. 26, 2013) ("It bears noting that a recent update of the manual eliminated the GAF scale because of "its conceptual lack of clarity ... and questionable psychometrics in routine practice," citing DSM-V at 16).

Griffith concedes that a GAF score "in and of itself in does not have a great deal of significance because [] it is reflective of symptoms or impairment of functioning in the relative

---

[15] 20 C.F.R. Part 404, Subpt. P, app'x 1, 12.00 (E) and (F) relate to the effect of structured settings on chronic mental impairments.  "Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication."  *Id*. at 12.00(E). Additionally, "overt symptomatology may be controlled or attenuated by psychosocial factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure.  Highly structured and supportive settings may also be found in your home."  *Id*. at 12.00(F).

time period around an examination." Doc. 16, p. 2. However, Griffith submits that "there is nothing that suggests repeatedly similar GAF scores cannot be indicative of an impaired degree of functioning from a longitudinal perspective." Doc. 16, p. 2. Although this statement may be true on a theoretical level, Griffith does not point to legal authority that requires an ALJ to consider multiple GAF scores in order to determine whether functioning impairments are severe, and case law suggests otherwise. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."). The ALJ, therefore, was not required to find Griffith's impairments severe based on Griffith's GAF scores. *See Howard*, 276 F.3d at 241.

### 2. The ALJ did not err in the weight he gave to opinion sources

Next, Griffith argues that "the ALJ relied on opinion sources that had insufficient evidence to conclude anything other than Mr. Griffith's mental health impairments were non-severe." Doc. 14, p. 12. He asserts that, "[w]hen the claim proceeded to the hearing level," he obtained and submitted over five hundred pages of medical records "reflecting psychological treatment." Doc. 14, p. 12 (citing Exhibits 16F, 18F, 19F, 22F, 23F, 24F, 25F, 27F, 28F, 29F). He faults the process because these medical records "were never seen, reviewed or examined by the paper reviewing consultants or the examining consultant."[16] Doc. 14, p. 12-13.

Dr. Rozenfeld did not have all Griffith's treatment records and it was not determined what treatment records were provided to Dr. Dubey. There is, likewise, no information

---

[16] Not all the records cited by Griffith involve psychological treatment. *See, e.g.*, Exhibit 19F (Dr. McIntire's mental functional capacity assessment); Exhibit 23F (analysis of blood work); Exhibit 25F, Tr. 684-722 (multiple lab test results). Furthermore, Dr. Dubey's examination on May 10, 2010, would not have contained a record of Dr. McIntire's assessment from July 7, 2011.

indicating what treatment records Dr. McIntire relied on.[17]  Thus, Griffith's argument—that the

ALJ should have given greater weight to Dr. McIntire's opinion but less weight to the opinions

of Drs. Dubey and Rozenfeld based solely on the records reviewed by them (Doc. 14, pp. 12,

19)— is not supported and, therefore, not well taken.

Moreover, the ALJ recognized that "the bulk of evidence regarding the claimant's mental

health" was not available to the state agency reviewers.  Tr. 78.  And, at the prompting of

Griffith's attorney, the ALJ explained that an attempt was made to ascertain what records were

provided to Dr. Dubey prior to Dr. Dubey's examination, but that the information was not

available.  Tr. 79, n. 1.  The ALJ stated that he had viewed all the evidence and that it did not

support a finding that Griffith had severe mental impairments.  Tr. 78.  He cited to opinion

evidence recently submitted by Griffith, Exhibits 19F (Dr. McIntire) and 22F (Dennis Rumer),

but found that the opinions: (1) were not fully supported by the objective medical evidence; (2)

were dependent upon Griffith's own reports of symptoms and functional limitations, but that

Griffith was not wholly credible; and (3) were inconsistent with evidence of Griffith's daily

activities.  Tr. 79.  *See* 20 C.F.R. 416.927 (when evaluating medical opinion evidence, the ALJ

considers nature, extent and length of treatment relationship, supportability, and consistency).

A court may not substitute its findings for those of the Commissioner if substantial

evidence supports the Commissioner's findings and inferences.  *Garner*, 745 F.2d at 387.  Even if

there is evidence that also supports a different conclusion, "the decision of the [ALJ] must stand

if substantial evidence supports the conclusion reached.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d

388, 389 (6th Cir. 19*99).

---

[17]  *See* Tr. 410, 481, 500, 515, 583, 654, 546, 684, 785, 905 (letters submitting exhibits cited above, all dated after Dr. McIntire's assessment).

Griffith argues that "[n]one of the ALJ's reasons" for giving greater weight to the opinions of Drs. Duby, Rozenfeld and Goldsmith "were supported by evidence."  Doc. 14, p. 21. Griffith urges the Court to consider that Dr. McIntire's finding of marked limitations was consistent with and well supported by Griffith's treatment records.  Doc. 14, p. 15.  In support of his argument, Griffith contends that he had previously reported suicide attempts, and that the record revealed an attempted suicide in February 2007, which he survived "because he was found by his mother after an intentional overdose."  Doc. 14, p. 16.  The Court notes that the treatment record from the emergency room also reflects Griffith's statement that he had been drinking with friends and that he did not recall taking the pills. Tr. 540.   Moreover, Griffith had denied prior suicide attempts both before and after the February 2007 emergency visit.  Tr. 575, 847.

Griffith also asserts that there is no evidence showing that his mental health substantially improved from the time he was initially awarded SSI benefits in 1995.  Doc. 14, p. 16.  The record, however, reveals that Griffith occasionally reported that he was not suffering from depression or anxiety.  *See, e.g.*, Tr. 569 (Marion treatment record in which Griffith stated, "[t]he court wants me to get an evaluation.  I know I'm okay."), Tr. 811 (Griffith reporting improvement on Elavil), Tr. 804 (Griffith reporting he was "okay" without Elavil), Tr. 801 (Griffith reporting he is doing "okay" without medication, then "depressed since he stopped meds," then "doing well on Prozac."), Tr. 295 (Griffith reporting no complaints of depression), Tr. 835 ("I'm not depressed or suicidal.  The only problem I have now is sleeping."), Tr. 798 (refusing mental health care services, stating that he was only taking medication because he had problems sleeping).

24

Griffith explains that, while incarcerated, he occasionally reported that he did not feel depressed in order to avoid being placed in a more restricted area of the prison.  Doc. 14, p. 17. This argument is problematic as it illustrates that Griffith is not reliable as a reporter of symptoms and not wholly credible, as the ALJ in fact found.  Tr. 79, 83.  The ALJ also explained that he found Griffith not credible, in part, because he was non-compliant with treatment.[18]  Tr. 83 (citing Exhibits 18F, 22F, 27F).   The ALJ observed, "such non-compliance would not be expected were the claimant's impairments as severe or disabling as alleged, and suggest that the claimant's symptomatology is tolerable without the need to follow these recommendations."  Tr. 83.  The ALJ also pointed out numerous inconsistencies and exaggerations in the record regarding Griffith's complaints of physical symptoms and his recitation of facts that further detracted from Griffith's credibility.  Tr. 82-83.  Lastly, the ALJ noted that, at the hearing, "there was significant reliance upon leading questions that suggested the answers given," which he found significantly eroded Griffith's reliability.  Tr. 83.

Griffith submits that, because the ALJ found him not wholly credible, the ALJ's reliance on Dr. Dubey's functional conclusions, based on Griffith's report of symptoms and abilities, should not have been assigned great weight.  Doc. 14, p. 18.  Dr. Dubey's functional conclusions were not based on Griffith's reports of symptoms.  See Tr. 311 (functional conclusions based primarily on Griffith's abilities that Dr. Dubey observed during the examination). The ALJ credited Dr. Dubey's opinion and found it consistent with the objective medical evidence in the record.  Even if the evidence Griffith points to is given full credit, the Court is required to affirm the ALJ so long as substantial evidence supports the ALJ's findings.  *See Jones*, 336 F.3d at 477

---

[18]   Griffith argues that he "only refused medications because they had caused him to have difficulty urinating," and that he was placed in solitary confinement for failure to produce urine on demand for a drug test.  Doc. 14, p. 17. The transcript record Griffith cites indicates that he stopped taking Elavil in December 2008 because it interfered with his ability to urinate.  Tr. 804.  The record also reflects that he was placed in solitary confinement because "Officer got mouthy with him so he mouthed back and that got him 15 days in seg."  Tr. 804.

(Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."); *Bass v. McMahon*, 449 F.3d 506, 509 (6th Cir. 2007)("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.").  The ALJ's decision that Griffith's mental impairments were not severe was supported by substantial evidence, and the ALJ's decision, therefore, must stand.  *See Her*, 203 F.3d at 389.

Having found that the ALJ did not commit error in Step Two of his analysis, the Court need not consider the Commissioner's argument that the ALJ's alleged error at Step Two is harmless.

### B.  The ALJ's RFC determination is supported by substantial evidence

Griffith argues that the ALJ "offered no substantial evidence to support his physical residual functional capacity determination."  Doc. 14, p. 21.  He contends that the ALJ's stated reasons were contrary to the evidence in the record as a whole.  Doc. 14, p. 21.  Specifically, Griffith takes issue with the ALJ's reliance on consultative examiner Dr. Albert's opinion.  Doc. 14, p. 22.

The ALJ found that "the record did not contain evidence of abnormal clinical and laboratory findings sufficient to document any further degree of loss of function" than that provided by the RFC.  Tr. 80.  The ALJ gave great weight to Dr. Albert's RFC opinion—that the severity of Griffith's symptoms and the effect on his functions is disproportionate to the expected severity, and not supported to the degree alleged.  Tr. 80, 342 (citing objective medical findings). The ALJ found that Dr. Albert's opinion was consistent with the objective medical evidence overall and consistent with the credible portion of Griffith's description of his activities of daily

26

living.  Tr. 80.  The ALJ assigned less weight to the opinions provided by Dr. Bonasso and

prison medical staff because these opinions "are not shown to pertain" to Griffith's current

activities of daily living; were inconsistent "with the credible portion of the evidence relative to

the claimant's activities of daily living"; and were "highly dependent upon the claimant's reports

of symptoms and limitations where the claimant is found to not be wholly reliable as a reporter

of symptoms and limitations."  Tr. 80.  The ALJ observed,

> The claimant has underlying medically determinable impairments that could reasonably
> cause some symptomatology.  However, the pivotal question is not whether such
> symptoms exist, but whether those symptoms occur with such frequency, duration or
> severity as to reduce the claimant's [RFC] as set forth above….In this case, a careful
> review of the record does not document sufficient objective medical evidence to
> substantiate the severity of the pain and degree of functional limitations alleged by the
> claimant.

Tr. 81.

Griffith contends that there was "no evidence to contradict [his] allegations of disabling

pain."  Doc. 14, p. 23.  However, "[s]ubjective complaints may support a finding of disability

only where objective medical evidence confirms the severity of the alleged symptoms."

*Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 20)04) (citing *Blankenship v.

Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1)989)).  Here, there is no objective medical evidence

confirming the severity reported by Griffith of his symptoms of pain.  Moreover, as discussed,

*supra*, the ALJ found that Griffith was not credible regarding his complaints of pain and

functional limitations.  See Tr. 82-84.  He pointed out that Griffith: sleeps on the couch; walks to

his brothers a few days a week; showers daily; attends appointments; and testified that he had no

problems riding in the car for the hour and fifteen minute drive to the hearing, all of which the

ALJ found inconsistent with an individual suffering debilitating back and neck pain.  Tr. 82.  The

ALJ also observed that Griffith completed a symptoms report in 2010 in which he reported "he

has '9' level pain seven days a week and that his pain is 'all day,' 'everyday.'" Tr. 83.  The ALJ commented that such an individual would likely require hospitalization. Tr. 83.

The ALJ noted that Griffith has degenerative disc disease, but found that "the totality of objective medical evidence does not entirely support the claimant's contentions that he 'cannot move' and that he is more limited than the physical [RFC] assessed herein." Tr. 81.  The ALJ conceded that "there are minimal physical examinations with objective finds in the record," but noted that the few examinations do not support Griffith's allegations.  Tr. 81.  This finding was not improper.  *See Workman*, 105 Fed. App'x at 801 (the ALJ did not err in finding the claimant not credible based on the claimant's description of activities and discrepancies between his allegations and the medical evidence); *see also Garner*, 745 F.2d at 387 (court may not resolve conflicts in evidence or decide questions of credibility).

Finally, Griffith submits that the ALJ should have given more weight to the work restrictions assigned to him while he was incarcerated.  Doc. 14, p. 22-23 (citing medical records containing restrictions for lifting and standing, and requiring sit-down jobs).  However, a decision by prison medical staff regarding Griffith's alleged disability is not binding on the Commissioner.  *See* 20 CFR § 416.904.  Furthermore, as noted, the ALJ explained why he gave little weight to these opinions.  Tr. 80-83.  In sum, the record contains substantial evidence to support the ALJ's RFC determination.

### VII.  Conclusion and Recommendation

For the reasons set forth herein, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.


Dated: October 6, 2014

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).