IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Daniel L. Griffith,

      Plaintiff,      Case No. 3:13 CV 2136

 -vs-

               MEMORANDUM OPINION
               AND ORDER

Commissioner of Social Security,

      Defendant.

  Daniel L. Griffith applied for supplemental security income benefits with the Social Security Administration (SSA). After exhausting his available administrative remedies, the Commissioner of Social Security denied Griffith's application for benefits.

  Griffith then sought judicial review of the Commissioner's decision. The case was referred to Magistrate Judge Kathleen B. Burke for findings of facts, conclusions of law, and recommendations. The Magistrate Judge issued a report and recommendation (R&R) recommending I affirm the Commissioner's decision denying Griffith's applications for benefits. This matter is before me pursuant to Griffith's timely objections to the Magistrate Judge's R&R.

  I have jurisdiction over the Commissioner's final decision denying Griffith's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006). In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), I have made a de novo determination of the Magistrate Judge's R&R. For the reasons stated below, I adopt the Magistrate Judge's recommendations and affirm the Commissioner's decision denying Griffith's application for benefits.

### I. BACKGROUND

  Because Griffith has not objected to the Magistrate Judge's factual summary of the case as

set forth on pages two through fourteen of the R&R, I adopt the Magistrate Judge's findings.  The Magistrate Judge's uncontested summary of the case is as follows:

### I. Procedural History

Griffith was award SSI benefits in January 1995 due to mental health impairments.[1] Tr. 140, 45, 54. He continued to receive SSI benefits until May 2008, when he was incarcerated for over one year for drug possession. Tr. 140, 45-46, 55. Following his release from prison, Griffith refiled an application for SSI on January 15, 2010, alleging a disability onset date of September 1, 1994. Tr. 121, 125. He alleged disability because of affective disorders and depression. Tr. 144. After denials by the state agency initially (Tr. 93-97) and on reconsideration (Tr. 102-08), Griffith requested an administrative hearing. Tr. 109. A hearing was held before Administrative Law Judge ("ALJ") Christopher B. McNeil on May 15, 2012. Tr. 29-66. In his June 8, 2012, decision (Tr. 74-86), the ALJ determined that Griffith's residual functional capacity ("RFC") did not prevent him from performing work existing in significant numbers in the national economy, i.e., he was not disabled. Tr. 84. Griffith requested review of the ALJ's decision by the Appeals Council. Tr. 10-11. On July 31, 2013, the Appeals Council denied Griffith's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

### II. Evidence
#### A. Personal and Vocational Evidence

Griffith was born in 1968 and was 41 years old on the date his application was filed. Tr. 84. He has a ninth grade education and is able to communicate in English. Tr. 35, 84. He has no past relevant work. Tr. 84.

#### B. Medical Evidence
#### 1. Physical Evidence
**Back and neck pain.**

On January 11, 2002, Griffith had an MRI of his lumbar spine. Tr. 385. On September 11, 2002, Michael G. Mulligan, M.D., reviewed the MRI results and diagnosed spondylitic changes with significant bilateral foraminal stenosis in L5-S1, and a small central disc prolapsed at L4-5 with spondylitic changes producing mild bilateral foraminal stenosis. Tr. 385-86. Upon physical examination, Dr. Mulligan described a dramatically decreased range of motion in Griffith's lumbar area "with reproduction of pain in all motions." Tr. 386. He observed that Griffith had hamstring tightness. Tr. 386. The range of motion of Griffith's hip and knee were normal, as was his posture. Tr. 386. His gait was slow, wide-based and guarded. Tr. 386. He had minimal tenderness and reported that the pain is deeper than Dr. Mulligan was able to palpate. Tr. 386. Dr. Mulligan diagnosed intravertebral disc disorder. Tr. 386. He explained that he "had a long talk with [Griffith] about smoking cessation, what kind of pain he can listen to and what he needs to not listen to. I told him that he is very deconditioned and he needs to start getting in better shape for that." Tr. 386-87. He advised Griffith to begin exercises to strengthen his back and stomach. Tr. 387.

---

[1] Griffith testified that he received SSI benefits for severe depression and anxiety. Tr. 45, 54.

On October 10, 2002, Griffith had a second MRI that also revealed bilateral neural foraminal encroachment at L4-5 related to discogenic disease.[2] Tr. 380-81. On March 17, 2003, Christian Bonasso, M.D., performed surgery involving a multiple level laminectomy and facetectomy with bilateral foraminotomy, and internal fixation with a clarus spinal rod system. Tr. 354-356.

On July 25, August 8 and October 17, 2005, Dr. Aleksy Prok, M.D., a pain management specialist, treated Griffith with a series of three nerve branch blocks to alleviate symptoms of pain. Tr. 775, 780, 784, 562. On March 13, 2006, Dr. Prok treated Griffith with epidural steroid injections to alleviate symptoms of pain. Tr. 766. On January 10, 2006, Dr. Prok prescribed Methadone after Griffith reported that his Duragesic patches were not alleviating his symptoms. Tr. 767-768.

On June 25, 2006, Griffith was seen by a nurse while he was incarcerated at the North Central Correctional Institute.[3] Tr. 637. The nurse assigned him a 30-day work restriction of lifting no more than five pounds; standing for no longer than fifteen minutes; and having one medical "lay-in" day. Tr. 637.

On July 9, 2007, a prison doctor, Dr. Ahmed, assigned Griffith a one-year restriction to lifting no more than ten pounds; avoiding slippery surfaces; and having a sit-down job only. Tr. 598.

On September 14, 2006, Griffith had an MRI of his cervical spine after complaining of neck pain. Tr. 625. The radiologist, Donald Chakeres, M.D., noted: "There is some multilevel disc degeneration. The worst findings are at C7-T1 with large anterior osteophyestes. There are a few minor bulges and some minor narrowing in a few of the neural foramina but I do not see a major problem." Tr. 625. On September 18, 2007, Dr. Ahmed again assigned Griffith a one year work restriction of lifting no more than ten pounds; standing for no longer than fifteen minutes; and no bending or kneeling. Tr. 624.

On August 17, 2008, an unidentified prison doctor assigned Griffith a one-year work restriction of lifting no more than ten pounds; avoiding slippery surfaces; and having a sit-down job only. Tr. 723. Griffith was assigned the same restrictions again on August 28, 2009. Tr. 921.

On January 5, 2010, Griffith had a CT scan of his lumbar spine after describing sharp and continuous pain. Tr. 288-289. Dr. Brendan Astley noted that Griffith was tender when his paraspinal muscles were palpated. Tr. 288. He found grade 1 spondylolisthesis of L5-S1 with associated degenerative changes of the disc and ankylosing spondylolisthesis. Tr. 289. Upon referral from Dr. Astley, Griffith received an epidural steroid injection on January 14, 2010. Tr. 285-286.

**Pulmonary embolism.**[4]

On July 11, 2008, Griffith was diagnosed with a pulmonary embolism and acute pulmonary infarct. Tr. 76, 625. It was recommended that he take anticoagulants for the rest of his life, although he "is completely asymptomatic." Tr. 280. He testified that he does not experience any pain or fatigue. Tr. 44. At times, Griffith took Coumadin, an anticoagulant, as prescribed. Tr. 280, 458.

---

[2] The treatment note does not indicate the name of the physician that generated the report.
[3] Griffith was incarcerated intermittently during 2006-2008, although the exact dates are not discernible.
[4] Griffith does not allege that the ALJ erred in his findings regarding Griffith's pulmonary embolism impairment. For the sake of completeness, the Court briefly summarizes the medical history regarding this ailment.

**2. Mental Evidence**

According to a treatment note from Marion Area Counseling ("Marion"), Griffith first received treatment there in 1994 for alcohol dependency, dysthymia and personality disorder after an overdose suicide attempt. Tr. 569. The earliest evidence in the record is a treatment plan dated May 8, 2001, explaining that Griffith was referred by the county court for alcohol or other drug assessment and domestic violence classes. Tr. 580. Upon mental examination, he was described as polite and cooperative, with a blunted affect.[5] Tr. 580. He complained that he had been depressed for years. Tr. 580. He was described as "negative" and having no motivation and poor sleep, although he reported that his social anxiety was not as severe as it had been. Tr. 580. The plan states, "[s]ays on SSI for depression but is ashamed and says it is for back injury. Refuses antidepressant—won't take pills." Tr. 580. In summary, the plan reads, "it is too bad he is resistant to meds as they could improve his depression and anxiety." Tr. 580.

Griffith was diagnosed with alcohol dependency, marijuana abuse, and dysthymic disorder. Tr. 580. He was assigned a GAF of 50.[6] Tr. 579, 580. On April 2, 2002, Griffith fulfilled the plan requirements and was terminated from the program. Tr. 579. Griffith's next treatment record is from Marion and is dated April 18, 2005. Tr. 569-577. Once again, he was referred by the county court, this time because of alcohol related vandalism. Tr. 569. Griffith stated, "[t]he court wants me to get an evaluation. I know I'm okay." Tr. 569. The reviewer noted that Griffith was on Methadone and Norco because of chronic back pain, and that his Methadone prescription had been increased because Griffith had developed a tolerance.Tr. 569. Griffith reported that he sometimes takes more than prescribed, runs out of the medication, and "can't hardly stand it." Tr. 569.

The assessor, D. Hawley, BSN, RN, PCC, described Griffith's relationship with drugs and alcohol as severe and chronic. Tr. 569. Hawley also found that Griffith's social, recreational and work-related activity had decreased because of continued chemical use. Tr. 570. Upon mental examination, Griffith's motor activities, manner, attitude and speech were normal. Tr. 574-575. His affect was pressured and rapid. Tr. 575. His memory, perception, attention and concentration were normal. Tr. 575. His insight and judgment were good. Tr. 575. He had insomnia, weight loss and decreased appetite. Tr. 575. He denied having suicidal thoughts and reported no known attempt. Tr. 575. He was assigned a GAF of 50. On December 20, 2005, Griffith was discharged from the program. Tr. 567-568.

On December 27, 2005, Griffith presented to an emergency room. Tr. 562. Dean R. Schilling, MA, PCC, completed a crisis intervention assessment. Tr. 562. Schilling explained that Griffith was "brought to the ER by his father complaining of chronic back pain, feelings of hopelessness, depression, and needing someone to talk to. Client denied suicidal plan or intent." Tr. 562. Schilling observed that Griffith

---

[5] The name of the individual assessing Griffith is illegible.
[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.*

4

"appeared to feel guilty about causing his back injury due to drinking and being in a car accident[], yet strangely denied that his back problems are a direct result of that and has been told that his back problems are due to a genetic degenerative back disorder." Tr. 562. Griffith complained about his doctors' ineffective pain prescriptions and accused Dr. Prok of withholding Vicodin as a punitive measure. Tr. 562. At the time of the assessment, Dr. Prok had taken Griffith off Vicodin and prescribed a duragesic patch for pain. Tr. 562. Schilling noted that Griffith's wife encouraged him to "give the patch time to work," but that Griffith "refused." Tr. 562. He also described how Griffith failed to understand that the post-surgical medication dosages prescribed by his doctors were for acute, post-surgical pain, and not intended to be a long-term maintenance dose. Tr. 562. At the emergency room, Griffith was given a shot of Tegretol and Phenergan to resolve his pain symptoms. Tr. 562. Schilling concluded that Griffith "gives some indication of potential Vicodin addiction" and that "there are several factors in this account that do not logically add up." Tr. 562.

Upon mental examination, Griffith was described as "sitting comfortably on the ER bed." Tr. 562. He had adequate eye contact and grooming, and a pleasant, cooperative manner. Tr. 562. He was alert and oriented, albeit with intermittent tearfulness and depressed affect. Tr. 562. His thought process was described as clear, coherent, logical and goal directed with no sign of blocking or concentration problems. Tr. 562. His intellect, insight and judgment were rated average. Tr. 562. He was assessed a GAF of 60.[7] Tr. 564.

Griffith was incarcerated from 2006 through 2009 and received mental health treatment See, e.g., Tr. 873, 878, 881, 885, 892, 901. He was generally described as having a depressed mood. See, e.g., Tr. 873, 901. He was prescribed Elavil for depression on November 30, 2006. Tr. 620.

On February 27, 2007, while on probation, Griffith was taken to the emergency room after he overdosed on Elavil pills. Tr. 537. He explained that he had been drinking with friends and that he did not recall taking the pills. Tr. 540. His diagnosis assessment, prepared by Debra Merold, a social worker, indicates illegal drug abuse, prescription drug abuse, and alcohol abuse. Tr. 544. Upon mental examination, Griffith was described as depressed because of concerns regarding the breakup of his marriage. Tr. 540, 547, 548. He was not interested in a referral to Alcoholics Anonymous or another support group. Tr. 548. Merold diagnosed him with moderate depressive psychosis and assigned a GAF of 50. Tr. 549.

Griffith returned to prison and, on May 11, 2007, was assessed by Abul Q. Hasan, M.D. Tr. 847-48. Dr. Hasan diagnosed Griffith with a mood disorder and assessed a GAF of 60. Tr. 848. He noted that Griffith reported improvement on Elavil (Tr. 811) and gradually increased the dosage. Tr. 849.

On November 3, 2008, Griffith stopped taking Elavil because it interfered with his ability to urinate when directed to do so in order to comply with a urine test. Tr. 804. A month later he stated that he was doing "okay" without it. Tr. 804. By May 2009, Griffith was taking Prozac, but admitted it was only to help him sleep and that he did not have problems with sleep "in the open community." Tr. 797-798. He refused mental health aftercare services. Tr. 798. On November 24, 2009, while

---

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR, at 34.

5

living in a halfway house, Griffith saw Dr. Astley for back pain and reported no complaints of depression. Tr. 295. Dr. Astley reinforced the importance of strengthening exercises. Tr. 289.

On April 7, 2011, Dennis Rumer, a therapist at Marion, completed a diagnostic assessment. Tr. 487. Griffith had completed phase one of his Alcoholics Anonymous program and had avoided cannabis for six months. Tr. 487. He reported a lifelong history of depression characterized by isolation, loss of motivation, insomnia, increased pain and recurrent suicidal thoughts. Tr. 487. Rumer diagnosed him with alcohol and cannabis dependence and assigned a GAF of 40.[8] Tr. 488. A week later he was examined at Marion by Sharon Orso, MSN. Tr. 482. Orso noted that Griffith was off medication and she prescribed him Cymbalta, for depression and back pain, and Seroquel. Tr. 482. She diagnosed major depression-recurrent and assigned a GAF of 45. Tr. 482.

On May 15, 2011, Griffith presented to the emergency room complaining of rib pain. Tr. 509. He reported that he fell while walking on some rocks. Tr. 509. He indicated that he was not taking medication. Tr. 509. He was discharged with a diagnosis of bruised ribs and prescribed Vicodin. Tr. 508. Griffith had no further contact with Marion. On September 6, 2011, he was discharged from the program because he failed to continue treatment. Tr. 516-17.

**C. Non-Medical Evidence**

On February 24, 2010, Griffith filled out a function report. Tr. 152-159. His described his daily activities as watching television all day and going to the doctors every few weeks. Tr. 152. He stated that he never prepares his own meals because he does not know how to cook and it has always been done for him. Tr. 154. He rarely goes outside and does not shop. Tr. 155. He does not like being alone, but does not like being around people he does not know. Tr. 155, 157. He gets along "good" with authority figures and follows written and oral instructions well. Tr. 157-158. He does not handle changes in routine or stress well. Tr. 158.

**D. Medical Opinion Evidence**
**1. Consultative Examiners**
    **a. Sudhir Dubey, Psy.D.**

On May 10, 2010, Dr. Dubey conducted a psychological consultative examination. Tr. 307-11. Griffith reported a history of back pain and blood clots but denied current and past psychiatric care. Tr. 308. He stated that his physical symptoms affect his ability to work. Tr. 308. Upon mental status examination, Dr. Dubey described Griffith's posture, gait, and behavior as normal. Tr. 308-09. His thought process was logical. Tr. 309. Griffith complained that he was feeling stressed that day and described his general mood as depressed. Tr. 309. He denied feeling discouraged, hopeless, helpless or guilty. Tr. 309. He denied suicidal or homicidal ideation. Tr. 309. Dr. Dubey noted that Griffith's symptoms are consistent with mild depression. Tr. 309.

---

[8] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

Griffith reported that he spends his days watching television. Tr. 310. He claimed that he can perform daily chores independently if needed. Tr. 310. He is able to bathe and perform personal hygiene adequately. Tr. 310. He is able to drive and has a temporary license and he interacts socially with family. Tr. 310. He reported no recreational activities or hobbies and complained of a depressed mood, in part because he was having problems adjusting after being released from prison. Tr. 310. Dr. Dubey, in summary, opined that Griffith was consistent, credible and reliable. Tr. 310.

Dr. Dubey diagnosed Griffith with adjustment disorder with depressed mood and personality disorder. Tr. 311. He found that Griffith was not impaired in his ability: to understand, remember, and follow simple instructions; to maintain attention, concentration, persistence, and pace; to perform simple, repetitive tasks; to relate to others, including fellow workers and supervisors; and to understand and follow complex instructions. Tr. 311. He found that Griffith was mildly impaired in his ability to: withstand stress and pressure associated with day-to-day work; and perform complex tasks. Tr. 311. He assessed a GAF of 65 based on Griffith's overall levels of functioning.[9] Tr. 310.

### b. Don McIntire, Ph.D.

On July 7, 2011, Dr. McIntire completed a mental functional capacity assessment. Tr. 501-03. Upon mental status examination, Dr. McIntire described Griffith as having a well-coordinated gait and full use of limbs. Tr. 502. He noted that Griffith appeared friendly but depressed. Tr. 502. Griffith reported that he was: depressed, anxious, paranoid, and suffered from panic attacks; and that he had feelings of hopelessness, worthlessness, irritability, and low self-esteem. Tr. 502. Although Griffith was taking Cymbalta and Seroquel he reported no benefit.[10] Tr. 502. He related a history of suicide attempts, including his overdose on pills in 2007. Tr. 502. His concentration was poor, but he reported no problems with short-term memory. Tr. 502. He could recall two of three items after five minutes and perform serial sevens "a little." Tr. 502-03.

Dr. McIntire found that Griffith was markedly limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; and work in coordination without being distracted. Tr. 501. He found him moderately limited in his ability to carry out detailed instructions. Tr. 501.

### 2. State Agency Opinions

#### b. Mental Review

On June 5, 2010, Ellen Rozenfeld, Psy.D., completed a psychiatric review technique. Tr. 314-24. She noted that she did not have Griffith's treatment records and based her opinion on Dr. Dubey's examination and Griffith's function report. Tr. 324. She opined that Griffith had adjustment disorder with depressed mood and personality disorder, but that neither was a severe impairment causing more than

---

[9] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.
[10] Cymbalta is used to treat major depressive disorder and for pain relief. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 457, 572. Seroquel is used to treat psychotic disorders. *Id.* at 1566, 1698.

7

mild limitations in functioning. Tr. 314, 317, 319, 322-324. On October 7, 2010, Bruce Goldsmith, Ph.D., affirmed Dr. Rozenfeld's opinion. Tr. 333.

### E. Testimonial Evidence
#### 1. Griffith's Testimony

Griffith was represented by counsel and testified at the administrative hearing. Tr. 34-58. He testified that he received SSI benefits beginning in 1994 or 1995 because of severe depression and anxiety. Tr. 45. When he was previously imprisoned his benefits were cancelled but began again upon his release; however, upon his imprisonment for over one year, beginning in May 2008, his benefits were cancelled and he had to reapply upon his release.[11] Tr. 45-46.

In 1997 Griffith was involved in a car accident and injured his back. Tr. 42, 54. He stated that the pain from his neck and back prevents him from working. Tr. 53. He has not had a job in the last fifteen years. Tr. 51, 55-56.

Griffith stated that his is divorced and sleeps on a couch at his parents' house. Tr. 36. H[e] testified that his depression and anxiety did not improve at all since 1994. Tr. 45. He spends his days "sitting around" and watching television. Tr. 48. He takes showers daily and is able to get dressed, although he has difficulty putting on shoes and socks. Tr. 41, 47. He is able to drive, although he no longer has a driver's license. Tr. 35-36. He walks down the street to visit his brother a few times a week, but otherwise keeps to himself. Tr. 50. He has trouble sleeping because of "thoughts" and "pain." Tr. 49. He testified that he has crying spells daily and a poor appetite. Tr. 49. He also stated that he struggles with thoughts of suicide daily, and that he has attempted suicide two or three times in the past. Tr. 46-47.

He has not seen doctors after being released from prison because he has been unable to get a medical card, although he testified that he went to a counseling center for treatment the "last two, three weeks." Tr. 50. He stated that he went there previously and received medication, but that it did not help him so he gave up. Tr. 51. He admitted that he lied to prison staff when he denied having mental health issues. Tr. 56-57. He lied because the prison had a special unit for inmates with mental health issues, in which the inmates were given less freedom and he did not want to be placed in such a unit. Tr. 56-57.

## II.  STANDARD OF REVIEW

I have conducted a de novo review of the Magistrate Judge's R&R to which Griffith objects. 28 U.S.C. § 636(b)(1).  In so doing, I have reviewed the Commissioner's decision to determine whether it is supported by substantial evidence.  42 U.S.C. § 405(g).  I "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

---

[11] *See* 20 C.F.R. §§ 416.211(a)(1); 416.201 (a claimant is not eligible for SSI benefits while a resident of a public institution, such as a prison).

8

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). I do not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if I would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id.* at 854–55.

### III. GRIFFITH'S OBJECTIONS

Griffith objects to the Magistrate Judge's findings with respect to: 1) the ALJ's failure to consider global assessment of functioning (GAF)[12] scores at step two of the sequential evaluation; 2) the ALJ's treatment of Dr. McIntyre's opinion; and 3) the ALJ's physical residual functional capacity (RFC) finding. Each objection is taken in turn.

**OBJECTION I: GAF Scores and Step Two Determination**

Griffith argues the ALJ erred by failing to account for GAF scores which indicated he had more than a mild limitation in mental functioning. Due to this error, Griffith claims the ALJ incorrectly concluded his depression and anxiety were not severe impairments at step two of the sequential steps for evaluating social security benefits.

At step two, the ALJ determines whether a claimant's impairments are severe and whether they meet the twelve-month durational requirement. 20 C.F.R. § 416.920(a). The claimant bears the burden of proving the threshold requirement of a "severe impairment." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). The claimant must show that he suffered from medically severe impairments

---

[12] *See, supra,* footnote 6.

9

that lasted or could be expected to last for a continuous period of at least twelve months. *Id.* I must apply a *de minimis* standard in determining severity at Step Two. *Higgs*, 880 F.2d at 862. An impairment or combination of impairments is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). The types of "basic work activities" that qualify for use in the regulations are described in 20 C.F.R. §416.921(b). An impairment can be found non-severe only if it could constitute "a slight abnormality which has such a minimal effect on the individual that it could not be expected to interfere with an individual's ability to work, irrespective of age, education and past work experience." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statement of symptoms." 20 C.F.R. § 416.908.

At the outset, Griffith contends the Commissioner's step two finding is flawed because the ALJ did not discuss a variety of GAF scores indicating he had more than a mild limitation in mental functioning. Griffith claims the GAF scores should have been "carefully evaluated like all other opinion evidence of record." (Doc. No. 18, at 3). As support, Griffith points to an administrative message which he purports requires "SSA staff" to "consider GAF ratings as opinion evidence." (Doc. No. 18, Ex. A). However, after review, I find the message void of any statement or directive regarding GAF scores.

To the contrary, the Commissioner "has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorder listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) (*citing Wind v. Bart*, 133 Fed. App'x 684, n.5 (11th Cir. 2005)); 65 Fed. Reg. 50746, 50764-65 (2000). The legal authority provided by the Magistrate Judge also supports this contention. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006)

("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 469 (6th Cir. 2003) (ALJ's failure to refer to GAF score did not make his RFC analysis unreliable); 65 Fed. Reg. 50746, 50764-65 (2000) ("The GAF scale . . . [is] used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listing."). Therefore, the ALJ's failure to consider GAF scores at step two was not reversible error.

At step two, the ALJ reviewed the evidence and found that Griffith's depression and anxiety failed to cause more than a minimal limitation in his ability to perform basic mental work activities. He then evaluated the criteria for mental disorders under Section 12.00(C) of the Listing Impairments, addressed the four broad functional areas, and adequately explained his finding that Griffith's depression and anxiety were not severe. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1; *Schlacter v. Astrue*, No. 1:08CV617, 2012 WL 567609, at *5 (N.D. Ohio February 21, 2012). The ALJ correctly explained that Griffith's daily activities and social capabilities were not consistent with severe depression and anxiety: he could drive, watch television, listen to music, and socialize with family; he got along well with authority figures, spoke regularly with his children, and did not have issues dealing with the public. The ALJ also noted Griffith could follow through with projects and was able to pay attention.

The ALJ further supported his step two finding by pointing to Dr. Dubey's opinion, which indicated Griffith had no more than a mild limitation in only a few functional categories. While Griffith argues Dr. McIntyre's opinion evidences marked limitations, and thus supports a severity finding, the ALJ permissibly discredited this opinion as it was highly dependent upon Griffith's reports of symptoms and limitations. I find that this evidence is substantial.

Griffith also claims the ALJ's alleged error at step two later prejudiced his RFC analysis

because he failed to consider Griffith's mental and physical impairments in combination.  However, the ALJ specifically addressed and discredited Griffith's claims of debilitating depression and anxiety in determining his RFC by noting that Griffith failed to follow-up with mental counseling treatment, did not take medication, and refused treatment because he did not think he would need it.  The ALJ also found that Griffith lacked a significant amount of credibility and reiterated that his daily activities did not restrict Griffith to the extent he was precluded from work as assessed in the RFC.  This objection is rejected.

### **OBJECTION II:  The ALJ's Treatment of Dr. McIntyre's Opinion**

Next, Griffith argues Dr. McIntyre's opinion should have been afforded greater weight because "overwhelming evidence" supports that it is "the most consistent and well-supported opinion of the record."  (Doc. No. 18, at 5).  However, I am tasked with determining whether the Commissioner's decision is supported by substantial evidence; not whether substantial evidence exists in the record to support a different conclusion.  *Kyle*, 609 F.3d at 854-55.

As the ALJ explained, Dr. McIntyre's assessment of marked limitations conflicts with Griffith's reported activities of daily living.  It also conflicts with Dr. Dubey's findings that Griffith was mildly impaired in only a few functional categories.  Moreover, Griffith denied depression or anxiety on numerous occasions.  (Doc. No. 13, at 569) (Marion treatment record in which Griffith stated, "[t]he court wants me to get an evaluation. I know I'm okay."); (Doc. No. 13, at 804) (Griffith reporting he was "okay" without Elavil); (Doc. No. 13, at 295) (Griffith reporting no complaints of depression); (Doc. No. 13, at 835) ("I'm not depressed or suicidal. The only problem I have now is sleeping."); (Doc. No. 13, at 798) (refusing mental health care services, stating that he was only taking medication because he had problems sleeping).  He also occasionally denied suicidal thoughts.  (Doc. No. 13, at 309, 562, 575).

The ALJ correctly stressed that Griffith's credibility was significantly lacking.   I must

"accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citation omitted).  Griffith was not a reliable reporter of symptoms and limitations and regularly provided inconsistent reports to treatment providers.  For example, Griffith denied feeling discouraged, hopeless, helpless or guilty to Dr. Dubey, yet reported these symptoms to Dr. McIntyre.  Griffith reported a suicide attempt in February 2007, yet treatment records revealed he had been drinking and did not remember ingesting pills and he denied reports of suicide attempts to treatment providers after 2007.  (Doc. No. 13, at 540, 575, 847; Doc. No. 14, at 15).  Accordingly, I find the ALJ's decision to afford little weight to Dr. McIntyre's opinion is supported by substantial evidence.

**OBJECTION III:  The ALJ's Physical RFC Finding and Prison Doctor Restrictions**

Finally, Griffith claims the ALJ's RFC finding with respect to his physical limitations was conclusory and failed to afford prison doctors controlling weight.

A decision by prison medical staff regarding Griffith's alleged disability is not binding on the Commissioner.  20 C.F.R. § 416.904.  Notably, Griffith does not specifically identify which prison doctor, or doctors, were entitled to controlling weight.  Regardless, the ALJ provided good reasons for affording less weight to the opinions contained in the prison treatment records – they were not fully supported by the objective medical evidence, they conflicted with and did not pertain to Griffith's current activities of daily living, and were highly dependent upon Griffith's unreliable reports of symptoms and limitations.  (Doc. No. 13, at 80).  These reasons touch upon several of the factors an ALJ is required to consider when evaluating medical opinions.  20 C.F.R. § 416.927(c).

The ALJ provided ample support and explanation for his treatment of these opinions.  First, he discussed that the objective evidence, or lack thereof, failed to support these restrictions.  He also noted the opinions were highly dependent upon Griffith's unreliable and inconsistent reports of

symptoms and restrictions.  The ALJ then cited a variety of evidence that weighed against Griffith's overall credibility concerning these claims of physical limitation:  that Griffith smoked cigarettes despite claims of cardiac and pulmonary limitations; that Griffith slept on his mother's couch despite claims of debilitating neck and back pain; that Griffith was not compliant with treatment; and that Griffith made inconsistent and exaggerated statements to treatment providers.  Accordingly, the ALJ's RFC finding was supported by substantial evidence and he did not err with respect to his treatment of prison treatment records.

## IV. CONCLUSION

Having carefully reviewed the record, I find the Magistrate Judge's R&R to be well-reasoned and without error.  For the reasons stated above, the Magistrate Judge's R&R is adopted in its entirety and the Commissioner's decision denying benefits is affirmed.

So Ordered.

s/ <i>Jeffrey J. Helmick</i><br>United States District Judge